IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| CLIFTON BANKS, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 50282 |
| | ) | |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| DR. TIMOTHY S. CHAMBERLAIN, | ) | |
| DR. NANCY LANK, DR. MERRILL J. | ) | |
| ZAHTZ, KRISTINA MERSHON, | ) | |
| and JOHN VARGA, | ) | |
| | ) | |
| | ) | Judge John Z. Lee |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For three years, Dixon Correctional Center's medical staff failed to adequately alleviate Clifton Banks's abdominal pain. When Banks requested swift relief, Dixon's doctors and nurses seemed to move slowly. When Banks suffered severe pain, they prescribed mild medicines. And when Banks begged for new remedies, they defaulted to the same old approaches.

His endurance exhausted, Banks sued Wexford Health Sources, Inc. ("Wexford"), Dr. Timothy Chamberlain, Dr. Nancy Lank, Dr. Merrill J. Zahtz, and Nurse Kristina Mershon (collectively "Wexford Defendants"), along with Warden John Varga. Banks accuses the Defendants of deliberate indifference to his medical needs in violation of the Eighth Amendment (Counts I and III) and intentional

infliction of emotional distress (Count IV). He also alleges that Wexford's policies made it responsible for Chamberlain, Lank, Mershon, and Zahtz's conduct (Count II).

In response, the Wexford Defendants urge the Court to enter judgment on the pleadings in their favor, see Fed. R. Civ. P. 12(c). Likewise, Warden Varga asks the Court to dismiss the claims against him, see Fed. R. Civ. P. 12(b)(6). For the reasons below, the Court denies the Wexford Defendants' motion as to Counts I, III, and IV, grants the motion as to Count II, and grants Varga's motion in all respects.

## **Background**[1]

Since early 2016, Banks has suffered from abdominal pain. Am. Compl. ¶13, ECF No. 22. During the day, Banks sometimes could not eat. *Id.* ¶ 27. At night, he would often lie awake because of the shooting pain in his chest. *Id.* Every so often, the symptoms subsided. *Id.* ¶ 25. In the end, however, the pain always returned. *Id.* ¶ 27.

As a prisoner at Dixon Correctional Center, Banks relied on Wexford, a contractor hired by the Illinois Department of Corrections ("IDOC"), for his medical care. *Id.* ¶ 11. In seeking treatment for his illness, Banks has met with more than a dozen doctors and nurses employed by Wexford. *Id.* ¶¶ 13–75. Rather than catalog

---

[1] When reviewing a motion to dismiss, the Court assumes the alleged facts in the complaint are true and draws all possible inferences in favor of Plaintiff. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Similarly, when analyzing a Rule 12(c) motion, the Court considers the facts alleged in the pleadings in the light most favorable to the non-moving party. *See Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

2

all of Banks's appointments, diagnoses, and prescriptions, the following factual summary focuses on Defendants' participation in his care.

I. **Doctor Chamberlain**

Banks first saw Doctor Chamberlain about six months after he began to experience symptoms. *Id.* ¶ 21. During that appointment, Chamberlain ordered an ultrasound of Banks's abdomen. *Id.* In the meantime, he prescribed Omeprazole and recommended certain dietary changes. *Id.* For a time, Banks's pain diminished. *Id.* ¶ 25.

When the ultrasound results came in, Chamberlain diagnosed Banks with gallstones. *Id.* ¶¶ 23–25; Ex L., Am. Compl. at 3, ECF No. 22-2. Soon after, Banks told Chamberlain that the "intense unrelenting abdominal pain" had returned. *Id.* ¶ 26. His suffering was so severe, Banks said, that he had been unable to eat for days. *Id.* For reasons that remain unclear, however, Chamberlain had no further involvement in Banks's care. *Id.*

II. **Nurse Practitioner Mershon**

With Chamberlain out of the picture, Banks spent the next few months meeting with a rotating staff of nurses. *Id.* ¶¶ 27–31. Most of those appointments followed the same pattern. Banks would describe his symptoms and treatment history, the nurse would endorse over-the-counter medicines or dietary changes, and the pain would continue. *Id.* One of those nurses, Kristina Mershon, suggested that Banks take Lactulose every morning. *Id.* ¶¶ 32–33. At first, the Lactulose relieved Banks's symptoms. *Id.* ¶ 35. Then the pain reappeared. *Id.*

**III.     Doctor Zahtz**

Eventually, Banks secured an appointment with another doctor, Dr. Zahtz. *Id.* ¶ 36. Like Chamberlain, Zahtz ordered an ultrasound. *Id.* He also pledged that a surgeon would examine Banks within four weeks. *Id.* That did not happen. *Id.*

Over the next few months, the pain intensified. *Id.* ¶ 41. In the past, Banks's symptoms had occasionally subsided. *Id.* ¶ 35. By this point, however, Banks suffered abdominal pain on a near constant basis. *Id.* ¶ 41.

Alarmed, both Mershon and Zahtz scheduled a surgical consultation for Banks. *Id.* ¶¶ 41–42. During that session, Banks underwent another ultrasound, which revealed gallstones and a thickened gallbladder wall. *Id.* ¶ 44. Based on those findings, Zahtz diagnosed Banks with gallstones and promised to schedule surgery. *Id.* ¶ 47.

But a few weeks later, Zahtz reversed course. *Id.* ¶ 48. In his next meeting with Banks, Zahtz declared that he had no intention of treating the gallstones. *Id.* Instead, Zahtz insisted that Banks's condition was caused by gas, advised that he take Pepcid and Tylenol, and refused to arrange abdominal surgery. *Id.* ¶¶ 48–61.

**IV.     Doctor Lank**

Dismayed by Zahtz's refusal to treat his gallstones, Banks arranged to see a third doctor, Dr. Lank. *Id.* ¶ 65. After examining the ultrasound results, Lank confirmed that Banks's pain stemmed from gallstones and referred him for surgery. *Id.*

4

Two months passed. *Id*. During that time, Banks continued to endure intense pain. *Id*. ¶ 69. When Banks asks Dr. Lank about the delay, she said that the surgery had been rescheduled due to bad weather. *Id*. ¶ 73. That was in November 2018. *Id*. As of January 2019, however, when Banks filed his amended complaint, the surgery still had not taken place. *Id*. ¶¶ 74–75.

## V. Warden Varga

About two years after the pain began, Banks started to send emergency grievances to Varga. Am. Compl. ¶¶ 39; 57; 59; 71. In a report submitted on November 31, 2017, for example, Banks stated that none of the recommended treatments had alleviated his pain, complained about delays in seeing doctors, and asked to see a specialist. *Id*. ¶ 39. The following August, Banks lodged two more grievances faulting Dixon's medical staff for continuing to recommend ineffective treatments. *Id*. ¶¶ 57–59. Two months later, Banks entered yet another grievance detailing his symptoms and alerting Varga that several of his requests to see a doctor had been denied. *Id*. ¶ 71.

All told, Banks sent Varga six grievances. *Id*. ¶ 118. Varga never approved any of them. *Id*. Banks then filed this suit. *Id*. ¶ 75.

## **Discussion**

Defendants have filed two motions asking the Court to terminate this case. First, the Wexford Defendants submit that the amended complaint fails to state a viable claim against them and requests judgment on the pleading under Fed. R. Civ.

5

P. 12(c). Second, Warden Varga contends that Banks's claims should be dismissed under Fed. R. Civ. P. 12(b)(6).

## I. The Rule 12(c) Motion

### A. Legal Standard

Rule 12(c) permits a party to move for judgment after the complaint and answer have been filed. *See* Fed. R. Civ. P. 12(c). A Rule 12(c) motion tests the sufficiency of claims based on the pleadings. *Hayes v. City of Chi.*, 670 F.3d 810, 813 (7th Cir. 2012). When reviewing a Rule 12(c) motion, the Court takes all facts pleaded in the complaint as true and draws "all reasonable inferences and facts in favor of the nonmovant." *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016). "The pleadings include the complaint, the answer, and any written instruments attached as exhibits." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). A court will grant a motion for judgment on the pleadings when it is clear that the non-moving party cannot prove any set of facts sufficient to support its claim. *Hayes,* 670 F.3d at 813.

### B. Analysis

The Wexford Defendants urge the Court to enter judgment on the pleadings as to Banks's deliberate indifference (Counts I and III), *respondeat superior* (Count II), and IIED (Count IV) claims.[2] The Court addresses each claim in turn.

---

[2] The amended complaint includes two counts based on alleged violations of § 1983. Count I accuses the Defendants of "deliberate indifference" as to Banks's medical care. *See* Am. Compl. ¶¶ 81–82. Similarly, Count III charges the Defendants with "deliberate indifference to Mr. Banks' medical needs." *Id*. ¶¶ 99–123. Following the parties' lead, the Court treats Counts I and III as a single § 1983 claim for deliberate indifference.

6

1. **Deliberate Indifference**

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). For that reason, prison officials who are deliberately indifferent to prisoners' serious medical needs violate the Constitution. *See Estelle,* 429 U.S. at 104.

To state a claim for deliberate indifference, a plaintiff must allege: (1) he was suffering from an objectively serious medical condition, and (2) the defendants were deliberately indifferent to this condition. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The first element is not at issue here. *See* Mem. Supp. Rule 12(c) Mot. ("Mot. J.") at 2–9, ECF No. 54.

As to the second element, "[d]eliberate indifference requires more than negligence, rather the defendant must meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014). Notably, however, the Seventh Circuit has "rejected the notion that the provision of some care means that doctor provided medical treatment which meets the basic requirements of the Eighth Amendment." *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016), *as amended* (Aug. 25, 2016). "A delay in treating non-life-threatening but painful conditions," for example, "may constitute deliberate indifference if the delay . . . unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). In a similar vein, "a doctor's choice of the

easier or less efficacious treatment for an objectively serious medical condition can still amount to deliberate indifference." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). With these teachings in mind, the Court has no trouble finding that Banks states a viable deliberate indifference claim against Chamberlain, Mershon, Lank, and Zahtz.

### a. Doctor Chamberlain

During his first meeting with Banks, Chamberlain prescribed several medications, suggested dietary changes, and ordered an ultrasound. Am. Comp. ¶ 22. In reviewing the ultrasound results, Chamberlain recognized that Banks had gallstones and suffered severe pain as a result. *Id.* ¶¶ 25–26. But the pleadings do not show that Chamberlain took any additional steps to treat that condition. *Id.* ¶ 26. A reasonable inference—although not the only one—is that Chamberlain's inaction "unnecessarily prolonged [Banks's] pain." *Arnett*, 658 F.3d at 753. Had Chamberlain recommended surgery to address the gallstones, for instance, Banks may well have avoided years of suffering. For now, that is sufficient for Banks's claim against Chamberlain to survive.

Anxious to avoid this result, the Defendants make much of the fact that Chamberlain proposed a modified diet that temporarily relieved Banks's symptoms. *See* Mot. J. at 4–5 (citing Am. Compl. ¶ 25). Yet a doctor's initial success cannot justify his failure to act when an inmate's symptoms return. And, given that Banks continued to suffer even after going without food for days, see Am. Compl. ¶ 26, Chamberlain could not have believed that the dietary modifications offered a

8

permanent solution. *See Petties*, 836 F.3d at 729–30 ("Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective."). As such, Banks states a plausible § 1983 claim as to Chamberlain.

### b. Nurse Practitioner Mershon

For the same reasons that Banks's § 1983 claim against Chamberlain survives, his claim against Mershon does too. Echoing their earlier argument, the Wexford Defendants insist that Mershon cannot be guilty of deliberate indifference because the remedy she proposed—that Banks take Lactulose each morning—reduced his pain for a time. Mot. J. at 6 (citing Am. Compl. ¶¶ 32–33). Again, that short-lived success did not relieve Mershon of her obligation to address Banks's suffering when it reemerged. The next time Mershon saw Banks, for example, she perceived that his gallbladder had filled with stones and that he "no longer had periods time that were pain free." Am. Compl. ¶ 41. But, although Mershon referred Banks to a surgeon, that appointment did not take place for almost seven weeks. *Id*.

As the Wexford Defendants see it, Merhson's medical decisions were "reasonable," "responsive," and "entitled to the Court's deference." Mot. J. at 6. At this stage, however, the Court draws reasonable inferences in Banks's favor, not Mershon's. Perhaps Mershon should have prescribed powerful painkillers to allay Banks's symptoms until the surgery. *See, e.g.*, *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (finding that offering "ice and ibuprofen" to treat a fracture may constitute deliberate indifference). Perhaps Mershon should have advocated for the surgery to

9

happen sooner rather than later. *See, e.g., Grieveson v. Anderson*, 538 F.3d 763, 778–79 (7th Cir. 2008) (deciding that guards who waited a day and a half before securing treatment for an inmate's broken nose could be liable under § 1983). Or perhaps Mershon did all she could to mitigate Banks's suffering. Based on this limited record, the Court cannot tell, and Banks's claim against Mershon may proceed.

### c. Doctor Lank

Following similar logic, Banks also has adequately pleaded that Lank acted with deliberately indifference to his medical needs. Once again, the Wexford Defendants paint Lank's treatment as "the *antithesis* of deliberate indifference." Mot. J. at 7. But, as with Chamberlain and Mershon, Lank's conduct is susceptible to multiple interpretations. True, Lank renewed Banks's prescriptions. Am. Compl. ¶ 65. Yet she knew that those medications had not proven effective in the past. *Id.*; *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("[M]edical personnel cannot simply resort to an easier treatment that they know is ineffective."). And, although Lank entered a surgery referral, no surgery occurred for two months, if not longer. Am Compl. ¶ 75; *see also Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (observing that "fail[ing] to provide a promised specialist for six months" may qualify as deliberate indifference). Again, perhaps discovery will back up Lank's defense, but Banks states a viable claim at the pleading stage.

### d. Doctor Zahtz

The Wexford Defendants' attempt to defeat the deliberate indifference claim against Zahtz likewise is unavailing. If Zahtz had scheduled gallstones surgery when

10

he promised, see Am. Compl. ¶ 47, Banks's suffering may have ended that much sooner. It is no answer to say, as the Wexford Defendants do, that Zahtz "believed that Plaintiff's abdominal complaints were related to gas." Mot. J. at 9. According to the pleadings, Zahtz initially diagnosed Banks with gallstones and had no reason to alter that diagnosis. Am. Compl. ¶¶ 48; 52; 54; 68. Based on those allegations, one plausible inference is that Zahtz blamed Banks's symptoms on gas as an excuse for "resort[ing] to an earlier course of treatment that [he] kn[e]w [wa]s ineffective." *Petties*, 836 F.3d at 730. At this stage, the allegations in the complaint are sufficient for Banks's § 1983 claim as to Zahtz to go forward.

### 2. Intentional Infliction of Emotional Distress

Supplementing his deliberate indifference claim, Banks also charges the Wexford Defendants with intentional infliction of emotional distress ("IIED"). To state an IIED claim under Illinois law, a plaintiff must allege: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Id.* (quoting *Kolegas*, 607 N.E.2d at 211).

11

Returning to a familiar refrain, the Wexford Defendants portray their conduct as "a consistent and effective course of medical care." Mot. J. at 13. As noted above, however, taking Banks's allegations to be true and drawing all reasonable inferences in his favor, it could be said that Dixon's doctors and nurses only recommended treatments that they knew were ineffective, causing Banks to suffer severe pain for years. So understood, Banks's IIED claims satisfy the extreme and outrageous standard. *See Rice v. Wexford Helath Services, Inc.*, No. 14 C 4978, 2016 WL 8711490, at *6 (N.D. Ill. Jan. 29, 2016) (suggesting that deliberate indifference and IIED claims usually rise or fall together).

As a last resort, the Wexford Defendants fault Banks for relying on "conclusory assertions" to support his IIED claim. Defs.' Reply Pl.'s Resp. ("Defs.' 12(c) Reply") at 8–9, ECF No. 61. But that misreads the amended complaint. In fact, Banks's IIED claim incorporates seventy-five paragraphs of pleadings detailing the Defendants' alleged failure to provide medical care. Am. Compl. ¶¶ 1–75. For now, those allegations suffice to support Banks's IIED claim.

### 3. Respondeat Superior

Banks also raises what he calls a "respondeat superior" claim (Count II) against Wexford. For the most part, however, "respondeat superior liability does not apply to private corporations under § 1983." *Shields v. Illinois Dep't of Corrs.*, 746 F.3d 782, 789–96 (7th Cir. 2014). That said, a private entity performing a governmental function can be liable under § 1983 if the alleged constitutional deprivation resulted from the defendant's "policy or custom." *Woodward v. Corr. Med.*

*Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2014) (citing *Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 659 (1978)).

Here, however, Banks has failed to adequately plead that Wexford maintained any "policy or custom" that gave rise to his injuries. *Id.* It is true that Banks alleges that "Wexford had policies, procedures and customs in effect that inflicted unnecessary suffering on Mr. Banks." Am. Compl. ¶ 88; *see also id.* ¶¶ 87; 89; 90. Without more, however, those conclusory assertions do nothing to "nudge [Banks's] claim . . . across the line from conceivable to plausible." *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th 2011) (citation and quotations omitted). Thus, Banks's claim against Wexford itself (as distinct from the doctors and nurses Wexford employed) falls short.[3]

## II. Varga's Motion to Dismiss

### A. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And,

---

[3] In some cases, identifying "a series of violations" may be enough to establish that a custom or policy caused the alleged constitutional deprivation. *Palmer v. Marion Cty.*, 327 F.3d 588, 595–96 (7th Cir. 2003). But Banks does not raise this possibility in his response, so the Court does not address it. *See* Pl.'s Resp. 12(c) Mot. ("Pl.'s 12(c) Resp.") at 11–12; *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("[U]ndeveloped arguments are waived.")

when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) (citing *Luevano v. Wal–Mart Stores, Inc.*, 722 F.3d 1014, 1027 (7th Cir. 2013)).

At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). Accordingly, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**B. Analysis**

Like the Wexford Defendants, Varga maintains that Banks has failed to adequately support his § 1983 and IIED claims. For the reasons that follow, the Court agrees.

**1. Deliberate Indifference**

Under § 1983, inmates can only sue prison officials who participated in the alleged constitutional violation. *See Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault.") (citations and internal quotation marks omitted). Here, Banks has failed to establish that Varga was personally involved in his medical care.

As a general matter, prison supervisors may "relegate to the prison's medical staff the provision of good medical care." *Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir. 2009). Consistent with that principle, courts reject deliberate indifference claims

14

against wardens who know that "medical personnel [are] treating [the inmate] on a regular basis." *Arnett*, 658 F.3d at 756. When a warden recognizes that medical staff have "completely ignor[ed]" the inmate, however, courts permit such claims to proceed. *Id.*; *see also Hardy v. Wexford Health Sources, Inc.*, No 12 C 6554, 2015 WL 1593597, at *8 (N.D. Ill. Apr. 2, 2015) ("[I]n the absence of allegations that [the plaintiff] was completely ignored by medical staff," the warden may "rely on the medical judgments supporting the treatments.").

For his part, Banks posits that Varga "knew that [he] was not receiving adequate medical treatment" because his pain persisted for years. Pl.'s Resp. Mot. Dismiss. ("Pl.'s 12(b)(6) Resp.") at 7, ECF No. 60. But that is not supported by the complaint. What Varga knew is that Dixon's doctors and nurses examined Banks numerous times, wrote at least a dozen prescriptions, and performed multiple ultrasounds. *See* Am. Compl. ¶¶ 39, 57, 59, 71. Having entrusted Banks to "the care of medical experts," Varga was "justified in believing that the prisoner [wa]s in capable hands." *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (citation omitted).

In any event, "[r]uling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation." *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007); *see Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is no personal involvement by the warden [in an inmate's medical care] outside the grievance process, that is insufficient to state a claim against the warden."); *Brown v. Wexford Health Sources, Inc.*, No. 13 C 4419, 2014 WL 257552, at *3 (N.D. Ill. Jan. 23, 2014) (finding that a warden's "refusal to

15

consider two emergency grievances as emergencies . . . does not indicate that [he] caused or participated in Plaintiff's alleged inadequate medical care"). Accordingly, Varga's refusal to classify grievances as emergencies cannot establish his personal involvement in Banks's medical care.

*Griffin v. Wexford Health Sources, Inc.*, the case on which Banks relies, does not justify a departure from these principles. 244 F. Supp. 3d 787, 791–92 (N.D. Ill. 2016). Emphasizing that the plaintiff "spoke to [the warden] about failure to treat ongoing stomach pains," the court allowed a deliberate indifference claim against the warden to proceed. *Id.* To the extent that *Griffin*'s holding rested on the plaintiff's personal conversation with the warden, this case is different, because Varga's involvement was limited to reviewing emergency grievances. *Id.* To the extent that *Griffin* hints that a warden may be liable for deliberate indifference even when he knows that medical staff are treating an inmate, see *id.* at 791 n.3, it deviates from Seventh Circuit precedent. *See, e.g.*, *Greeno*, 414 F.3d at 656 ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). Ultimately, because Banks has failed to show that Varga participated directly in his care, his § 1983 claim against the warden must be dismissed.

### 2. Intentional Infliction of Emotional Distress

For similar reasons, Banks's IIED claim against Varga also fails. Here, the parties mainly disagree about whether Varga's conduct counts as "extreme and outrageous" under Illinois law. Declining to treat Banks's grievances as emergencies,

16

Varga says, falls short of that high standard. Mem. Supp. Mot. Dismiss ("Mot. Dismiss") at 5–6, ECF No. 50. By "den[ying] four . . . Grievance Reports," Banks retorts, "Varga allowed [him] to continue to suffer debilitating abdominal pain for over one-and-a-half years." Pl.'s 12(b)(6) Resp. at 12.

Once again, Varga has the better argument. Because Varga trusted Dixon's medical staff to treat Banks, his failure to second-guess their choices amounts at most to negligence or recklessness, not intentional outrageous conduct. *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 651 (7th Cir. 2003) (explaining that negligent or reckless conduct cannot support an IIED claim); *see, e.g.*, *Burks v. Lt. Sara Soto*, No. 15-CV-00055, 2016 WL 6442181, at *4 (N.D. Ill. Nov. 1, 2016) (dismissing an IIED claim against a prison supervisor because she lacked "medical expertise"). For these reasons, Banks's IIED claim as to Varga fails.

## Conclusion

In sum, the Court grants the Wexford Defendants' Rule 12(c) motion in part and grants Varga's motion to dismiss in full. Count II, the respondeat superior claim against Wexford, is dismissed with prejudice. Counts I, III, and IV, the deliberate indifference and IIED claims, are dismissed with prejudice as to Varga, but may proceed as to Chamberlain, Mershon, Lank, and Zahtz. In keeping with these rulings, Varga and Wexford are terminated as Defendants.

**IT IS SO ORDERED.**          **ENTER: 3/9/20**

_____
**JOHN Z. LEE**
**U.S. District Judge**